UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELAINE HALL, *et al.*,

      Plaintiffs,

v.

GENERAL MOTORS, LLC,

      Defendant.

Case No. 19-cv-10186
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS (ECF No. 21)

In this putative class action, Plaintiffs bring a variety of statutory and common-law claims against Defendant General Motors, LLC ("GM") arising out of an alleged safety defect in the StabiliTrak system of their GM vehicles. (*See* First Am. Compl., ECF No. 19.)  GM has now moved to dismiss all of Plaintiffs' claims. (*See* Mot. to Dismiss, ECF No. 21.)  For the reasons that follow, GM's motion is **GRANTED** and Plaintiffs' First Amended Complaint is **DISMISSED WITH PREJUDICE**.

## I

GM is one of the world's leading automakers.  One of the vehicles that it designs and manufactures is the Chevrolet Impala. (*See* First Am. Compl. at ¶1, ECF No. 19, PageID.327.)  Plaintiffs are consumers "who purchased … 2010 through

2016 Chevrolet Impala and 2014-2016 Chevrolet Impala Limited vehicles [] in the United States" (the "Class Vehicles"). (*Id.*) Plaintiffs purchased their vehicles on the used-car market. (*See*, *e.g.*, ¶8, PageID.331.)

The Class Vehicles are equipped with a "StabiliTrak electronic stability control system" that is designed to "proactively help drivers maintain control of their vehicles in situations where the vehicle is beginning to lose directional stability." (*Id.* at ¶¶ 2, 37, PageID.327-328, 341.) Plaintiffs assert that the StabiliTrak system "contain[s] one or more design and/or manufacturing defects … that can cause the vehicle to pull to one side (particularly while turning), hesitate, jerk, brake/lock wheels, lose power and/or stall." (*Id.* at ¶2, PageID.327-328.) Plaintiffs refer to this defect as the "StabiliTrak Defect." (*Id.*) Plaintiffs contend that the StabiliTrak Defect "is caused by a defective wheel speed sensor wiring harness which is subject to unintended wear, stress and abrasion from normal use that can cause various types of damage." (*Id.* at ¶39, PageID.342.) This "damage," in turn, "can cause the signals from the wheel speed sensor to become erratic" and cause the "symptoms" described above. (*Id.* at ¶¶ 3, 39, PageID.328, 342.) Plaintiffs insist that:

> The StabiliTrak Defect has been documented to occur under a variety of driving conditions, and presents a grave safety hazard that renders the Class Vehicles unreasonably dangerous to consumers because of the increased probability that the vehicle will be involved in an accident, as well as the possibility that Class Members may become stranded under unsafe conditions. Numerous owners have reported their vehicles pull to one side and/or emit a loud

> grinding noise while turning, others have reported
> hesitation, jerking, random braking/locking of the wheels,
> loss of power and stalling. These symptoms are sometimes
> accompanied by illumination of one or more warning
> lights including the "ABS" warning light, the "Service
> StabiliTrak" warning light and the "Service Traction
> Control" warning light.

(*Id.* at ¶3, PageID.328.)  Finally, Plaintiffs claim that GM "concealed" and "failed to disclose" the StabiliTrak Defect to Plaintiffs and the public. (*Id.* at ¶7, PageID.330.)

# II

Plaintiffs filed their First Amended Class Action Complaint, the operative pleading in this action, on May 16, 2019. (*See* Frist Am. Compl., ECF No. 19.)  The named Plaintiffs are as follows:

- Elaine Hall, a California resident who purchased a "used 2016 Chevrolet Impala Limited" from an "authorized GM dealer" in Los Angeles, California in July 2017. (*Id.* at ¶8, PageID.331);

- Herklee Carey, an Alabama resident who purchased a "used 2014 Chevrolet Impala Limited from Nissan of Mobile in Mobile, Alabama" in January 2015. (*Id.* at ¶12, PageID.332);

- Brandon Clark, an Illinois resident who purchased a "used 2014 Chevrolet Impala from Tom Sparks Automotive" in DeKalb, Illinois in July 2016. (*Id.* at ¶16, PageID.334.);

- Duranda Jones, an Illinois resident who purchased a "used 2013 Chevrolet Impala" from an "authorized GM dealer" in Pekin, Illinois in November 2017. (*Id.* at ¶20, PageID.336);

- Rebecca Bittner, a Pennsylvania resident who purchased a "used 2012 Chevrolet Impala" from an "authorized GM dealer" in Cumberland, Maryland in July 2015. (*Id.* at ¶24, PageID.337.); and

- James Fagre, a Missouri resident who purchased a "used 2012 Chevrolet Impala from Marshfield Chevrolet in Marshfield, Missouri" in March 2015. (*Id.* at ¶28, PageID.339.)

Plaintiffs bring claims against GM for fraud, violations of the consumer protection laws of various states, unjust enrichment, and breach of the Class Vehicles' implied warranties under state and federal law.

GM moved to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on June 13, 2019. (*See* Mot. to Dismiss, ECF No. 21.) The Court held a hearing on the motion on January 30, 2020. (*See* Hr'g Tr., ECF No. 37.)

### III

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id.* When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's

factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). Mere "conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV

GM moves to dismiss Plaintiffs' claims on several different grounds. The Court will address each category of Plaintiffs' claims separately.

## A

## 1

In Counts I-IV, VII-VIII, and XI of the First Amended Complaint, Plaintiffs bring a common-law fraud claim and claims based upon the consumer protection laws of various states against GM. The essence of each of these claims is that GM "concealed" and "failed to disclose" the StabiliTrak Defect to the public. (First Am. Compl. at ¶¶ 196-197, ECF No. 19, PageID.384.) Thus, these claims are in the nature of fraudulent omissions.

In order to prevail on this type of fraudulent omission claim in the defective product context, a plaintiff must plead, among other things, that "a manufacturer knew of [the] defect before sale." *McKee v. General Motors, LLC*, 376 F. Supp. 3d 751, 761 (E.D. Mich. 2019). *See also, e.g.*, *Herremans v. BMW of North America, LLC*, 2014 WL 5017843, at ** 16-17 (C.D. Cal. Oct. 3, 2014) ("Because [plaintiff] has failed adequately to allege BMW's knowledge of the defect when she purchased her car, the court concludes that she has not pled a material failure to disclose for purposes of [California's Unfair Competition Law and California Consumers Legal Remedies Act]"); *Kwintkiewicz v. Bentley Motors, Inc.*, 2011 WL 1336576, at *3 (D. Md. Apr. 7, 2011) (holding that common-law fraud claim under Maryland law required plaintiff to plead, among other things, that defendant "knew of the alleged defect" in allegedly defective vehicle). Indeed, Plaintiffs do not dispute that they must plead GM's pre-sale knowledge of the StabiliTrak Defect in order to proceed on their fraud claims and claims under state consumer protection laws. Instead, they insist that they have done so. (*See* Resp. to Mot. to Dismiss, ECF No. 28, PageID.702-706.)

## 2

Plaintiffs attempt to plead GM's pre-sale knowledge of the StabiliTrak Defect through three types of allegations. Individually and collectively, these allegations are not enough.

**a**

Plaintiffs first generally allege that GM had pre-sale knowledge of the StabiliTrak Defect through "pre-production testing," "aggregate warranty data," and other production-based sources:

> [A]s early as 2007, if not before, Defendant acquired its knowledge of the StabiliTrak Defect through sources not available to Plaintiffs and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Defendant's network of dealers and directly to Defendant, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendant in response to consumer complaints, and repair order and parts data received by Defendant from Defendant's network of dealers.

(First Am. Compl. at ¶42, ECF No. 19, PageID.343.)

These allegations are too vague and pleaded at too high a level of generality to support a reasonable inference that GM had pre-sale knowledge of the StabiliTrak Defect. Plaintiffs have not alleged any *facts* about GM's pre-production testing, any particular analysis GM completed based on that testing, or GM's repair order and parts data that, if proven, would establish GM's pre-sale knowledge of the StabiliTrak Defect. "[C]ourts routinely reject generalized allegations about 'testing' and manufacturer 'analyses,'" like those Plaintiffs lodge here, "made in support of finding knowledge of a defect." *McKee*, 376 F. Supp. 3d at 761-62 (dismissing plaintiffs' fraud claims). *See also Beck v. FCA US LLC*, 273 F. Supp. 3d 735, (E.D.

Mich. 2017) (dismissing fraud claim based upon failure to allege pre-suit knowledge of defect, collecting cases, and explaining that "[r]egarding the generic allegations of FCA's access to 'testing' and 'analysis,' courts have found substantially similar allegations to be insufficient to support an inference that a defendant knew about a design defect at the product's time of sale"); *Grodzitsky v. Am. Honda Motor Co., Inc.*, 2013 WL 690822, at *6 (C.D. Cal. Feb. 19, 2013) (dismissing fraud claims and noting that "Plaintiffs' generalized assertion that unspecified 'pre-release testing data' and 'aggregate data from Honda dealers' fails to suggest how this information could have informed Defendant of the alleged defect at the time of sale"). Simply put, Plaintiffs' allegations about GM's unspecified pre-sale testing and analysis are not sufficient to support a plausible inference that GM had pre-sale knowledge of the StabiliTrak Defect.

**b**

Next, in the First Amended Complaint, Plaintiffs quote two complaints consumers filed with the National Highway Traffic Safety Administration ("NHTSA") related to the StabiliTrak Defect. (*See* First Am. Compl. at ¶3, ECF No. 19, PageID.329.) Plaintiffs have also filed as an attachment to the First Amended Complaint a document that includes 596 consumer complaints that Plaintiffs say "are example consumer complaints filed with the NHTSA for the 2007 through 2016 model years." (*Id.* at ¶49, PageID.347; *see also* Consumer Complaints, ECF No. 19-

9.)  Plaintiffs insist that GM "monitored complaints submitted to NHTSA as part of its normal business operations" and that the complaints "demonstrate" that the StabiliTrak Defect was "widespread and dangerous." (First Am. Compl. at ¶49, ECF No. 19, PageID.347.)

These complaints do not support a plausible inference of GM's knowledge of the StabiliTrak Defect.  First, it is not clear to what extent Plaintiffs are relying on these complaints to establish GM's knowledge of the StabiliTrak Defect.  GM argued in its motion to dismiss that these complaints "do not show pre-sale knowledge" (Mot. to Dismiss, ECF No. 21, PageID.636), and Plaintiffs responded that GM's argument was a "red herring" because the complaints merely "help contextualize Plaintiffs' allegations and demonstrate that the StabiliTrak Defect is widespread and dangerous." (Resp. to Mot. to Dismiss, ECF No. 28, PageID.706.) Moreover, Plaintiffs did not cite any cases holding that the types of complaints Plaintiffs rely upon here can support a plausible inference that GM knew about the StabiliTrak Defect.  And courts, including two courts in this district, have found that such complaints are "insufficient to support a finding of [] knowledge." *McKee*, 376 F. Supp. 3d at 761. *See also Beck*, 273 F. Supp. 3d at 753 (concluding that plaintiff's reliance on NHTSA complaints was insufficient to support a plausible inference of defendant's knowledge of alleged defect).

Second, and in any event, the way in which Plaintiffs presented the consumer complaints to the Court is insufficient to support a plausible inference GM had pre-sale knowledge of the StabiliTrak Defect. Plaintiffs quoted two consumer complaints in the First Amended Complaint and then filed 596 total complaints as an attachment to that pleading. Plaintiffs do not specifically identify how many and which complaints (1) relate to the Class Vehicles at issue and/or (2) arise out of the StabiliTrak Defect specifically as opposed to some other potential defect with the complained-about vehicles. For example, 63 pages of the consumer complaints relate to 2007-2009 Chevrolet Impala vehicles, and those cars are not included in Plaintiffs' definition of the "Class Vehicles" (*i.e.*, 2010-2016 Chevrolet Impala vehicles and 2014-2016 Chevrolet Impala Limited vehicles). (*See* ECF No. 19-9, PageID.427-489.) In addition, some of the complaints are vague and/or include complaints about issues that are not included in the list of "symptoms" that Plaintiffs contend are caused by the StabiliTrak Defect. (*See e.g.*, *id.* at PageID.431 ("Every time I would drive the 08 Chevy Impala the key would not turn all the way out"); PageID.472 ("Consumer writes in regards to traction control problems" with no additional details); PageID.537 ("In the right rear section of the car there is a rattle all the time.") Finally, Plaintiffs acknowledge that less than half of the complaints were made before "the first Plaintiffs' purchase in January 2015." (Resp. to Mot. to Dismiss, ECF No. 28, PageID.695, 706.) Simply put, Plaintiffs have not presented

these complaints in a manner that can reasonably allow the Court to determine whether they tend to establish GM's pre-sale knowledge of the StabiliTrak Defect.

For all of these reasons, the Court declines to hold that the consumer complaints support a reasonable inference that GM knew about the StabiliTrak Defect.

**c**

Finally, Plaintiffs attempt to establish GM's pre-sale knowledge through three Technical Service Bulletins that GM issued related to the StabiliTrak and related systems. (*See* First Am. Compl. at ¶43, ECF No. 19, PageID.343.) A TSB is an "alert that informs authorized service technicians to pervasive issues affecting particular models and model years." *In re General Motors Air Conditioning Marketing and Sales Practices Litigation*, 406 F. Supp. 3d.618, 636-37 (E.D. Mich. 2019) ("*GM Air Conditioning*") (internal quotation marks omitted). Plaintiffs rely on the following TSBs:

- TSB No. 08-05-25-004A issued on October 27, 2008 (the "October 2008 TSB");

- TSB No. PIC5992 issued in April 2014 (the "April 2014 TSB"); and

- TSB PIC5992A issued in May 2016 (the "May 2016 TSB").[1]

---

[1] Plaintiffs identified several other TSBs in the First Amended Complaint, but they have not presented any arguments related to TSBs in their briefing and they do not appear to be relying on these other TSBs to establish GM's pre-sale knowledge.

The October 2008 TSB is titled "Antilock Brake System (ABS), Traction Control System (TCS), or StabiliTrak(R) Light On, [Diagnostic Trouble Codes] C00035-C0052 Set (Perform Diagnostic Test Procedure and Repair as Necessary)." (ECF No. 19-4, PageID.401.) The TSB identifies the relevant "condition" as follows: "Some customers may comment that the Antilock Brake System (ABS), Traction Control System (TCS), or StabiliTrak(R) (if equipped) warning lights are illuminated." (*Id.*) The TSB then instructs technicians that in order to resolve the problem with the warning light, they may need to "replace the wheel speed sensor." (*Id.*, PageID.402.)

The April 2014 and May 2016 TSBs are nearly identical to one another. They both share the same subject line: "Diagnostic Tip – ABS Lamp On With Any Of The Following [Diagnostic Trouble Codes] C0035 C0040 Or Unwanted Traction Control Activation." (ECF No. 19-7, PageID.423; ECF No. 19-8, PageID.425.) The "Condition/Concern" section of both TSBs says: "Some customers may comment on the ABS and/or TCS light being illuminated. This condition may be more easily duplicated while turning." (*Id.*) The TSBs then instruct technicians to "inspect the front Wheel Speed Sensor (WSS) jumper harnesses for any damage." (*Id.*)

The three TSBs do not support a reasonable inference that GM has pre-sale knowledge of the StabiliTrak Defect. That becomes clear when one contrasts the content of the TSBs with Plaintiffs' own definition of the StabiliTrak Defect.

As explained above, Plaintiffs have defined the StabiliTrak Defect as a wheel speed sensor wiring harness problem that causes "the vehicle[s] to pull to one side (particularly while turning), hesitate, jerk, brake/lock wheels, lose power and/or stall." (First Am. Compl. at ¶2, PageID.327-328.) And Plaintiffs insist that the defect "presents a grave safety hazard that renders the Class Vehicles unreasonably dangerous to consumers because of the increased probability that the vehicle will be involved in an accident." (*Id.*) Plaintiffs contend that these safety hazards caused by the StabiliTrak Defect "are sometimes accompanied by illumination of one or more warning lights," including the "Service StabiliTrak" warning light and the "Service Traction Control" warning light. (*Id.* at ¶3, PageID.328.)

The TSBs do not mention any of the "safety hazards" that lie at the core of Plaintiffs' definition of the StabiliTrak Defect. For example, the October 2008 TSB says only that vehicle owners may complain that certain warning lights, including the StabiliTrak warning light, may be illuminated. (*See* ECF No. 19-4, PageID.401.) And while that TSB does reference the potential need to replace the wheel speed sensor, the TSB does not suggest that the faulty sensor interferes in any way with an owner's ability to safely drive her vehicle. The October 2008 TSB thus does not support Plaintiffs' contention that GM had pre-sale knowledge of the StabiliTrak Defect. *See*, *e.g.*, *Mandani v. Volkswagon Grp. of Am., Inc.*, 2019 WL 652867, at *7 (N.D. Cal. Feb. 15, 2019) (dismissing fraud claim and concluding plaintiff had not

plausibly alleged knowledge of defect where TSB plaintiff relied upon did not reference the symptom plaintiff complained about in his vehicle: "This Court cannot conclude that one TSB notice related to noise issues, standing alone, means that Defendants had knowledge of a more-serious safety defect"); *Sloan v. General Motors, LLC*, 2017 WL 3283998, at *7 (N.D. Cal. Nov. 1, 2017) (dismissing fraud claim and rejecting plaintiffs' reliance on a TSB where "the TSB Plaintiffs [] rely on addresses the general problem of excessive oil consumption, and does not mention the alleged specific defect").

Nor do the April 2014 and May 2016 TSBs suggest that GM had pre-sale knowledge of the StabiliTrak Defect. Neither of these TSBs mention any of the alleged "safety hazards" that lie at the heart of the StabiliTrak Defect. Moreover, the subject lines of these TSBs do not reference the StabiliTrak system or the StabiliTrak warning light. (*See* ECF No. 19-7, PageID.423; ECF No. 19-8, PageID.425.) Thus, while it may be a plausible inference based on these allegations that GM was aware of *some* problem with the wheel sensors on the Class Vehicles, these TSBs do not plausibly establish that GM was aware of the specific StabiliTrak Defect plaintiffs have identified. *See*, *e.g.*, *Sloan*, 2017 WL 3283998, at *7 (noting that the relied-upon "TSB does not suggest that GM knew that all of the engines were inherently defective; indeed, the [alleged defect with the] Low-Tension Oil Rings are not even mentioned [in the TSB]").

Plaintiffs counter that the May 2014 and April 2016 TSBs do indicate that GM had pre-sale knowledge of the StabiliTrak Defect because the TSBs mentioned both "unwanted" activation of the "traction control" system and the illumination of the traction control warning light. (ECF No. 19-7, PageID.423; ECF No. 19-8, PageID.425.) But there is no suggestion in the TSBs that unwanted activation of the traction control system presents the type of safety issues that lie at the core of the StabiliTrak Defect. And it is not self-evident that extra traction control would cause the safety hazards allegedly associated with that defect – jerking, stalling, hesitation, etc. Moreover, Plaintiffs did not include unwanted traction control as one of the "symptoms" of the StabiliTrak Defect. For all of these reasons, the references to unwanted traction control in the two latter TSBs do not plausibly indicate that GM had pre-sale knowledge of the StabiliTrak Defect.

Notably, the TSBs cited by Plaintiffs here fall short of the TSBs that other courts – in cases cited by Plaintiffs – have found sufficient to establish a manufacturer's pre-sale knowledge (at least at the pleading stage). Unlike the TSBs here, the TSBs in those cases, on their face, were unmistakably linked to a core feature of the defect at issue. Consider the decision in *Bryde v. General Motors, LLC*, 2016 WL 6804584 (N.D. Cal. Nov. 17, 2016). In *Bryde*, the plaintiffs alleged that "one or more design or manufacturing defects in the Class Vehicles' airbag systems [could] cause the right front passenger airbag to fail to deploy when it

otherwise should." *Id.* at *1. The court held that the plaintiffs plausibly alleged GM's pre-sale knowledge of this defect by identifying, among other things, a TSB that GM had issued. That TSB identified a flaw in the very sensor that was responsible for powering the airbag. More specifically, it mentioned a "tear in the sensor circuit of a PPS pad" that "detect[ed] whether an adult is seated in the front passenger seat and, hence, whether the airbag should be on." *Id.* at ** 9-10. Thus, the TSB in *Bryde* directly concerned the failure of the airbag to engage – the precise defect the plaintiffs had complained about.

The TSBs in *Majdipour v. Jaguar Land Rover North America, LLC*, 2013 WL 5574626 (D.N.J. Oct. 9, 2013) and *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987 (N.D. Cal. 2013), also relied upon by Plaintiffs, are distinguishable for the same reason. In *Majdipour*, the plaintiffs alleged that that their Land Rovers' contained a "suspension defect" that caused, among other things, "leaks" in the front air springs of their suspension systems. *Id.* at *1. And the plaintiffs sought to establish Jaguar's knowledge of the defect based, in part, on a TSB that identified a specific "hairline crack[] in the rubber material of the front air spring." *Id.* at *3. Thus, the TSB at issue in *Majdipour,* on its face, was tied directly to the defect about which the plaintiffs complained. Likewise, in *Mui Ho*, the plaintiffs complained about a defect with their headlamps. And the TSBs relied-upon by those plaintiffs "addressed the alleged headlamp defect" at issue. *Mui Ho*, 931 F. Supp. 2d at 991. Here, in contrast,

the TSBs identified by Plaintiffs did not identify or mention any of the core features of the StabiliTrak Defect as defined by Plaintiffs, and thus those TSB's do not support a plausible inference that GM knew about the StabiliTrak Defect.

**3**

In *GM Air Conditioning*, *supra*, this Court held that the plaintiffs did plausibly allege that GM had pre-sale knowledge of a vehicle defect. Contrasting the knowledge allegations in that case with those made by Plaintiffs here helps to illuminate the insufficiency of Plaintiffs' allegations of GM's pre-sale knowledge.

The plaintiffs in *GM Air Conditioning* alleged that the air conditioning systems of their GM vehicles were defective. They contended that there were cracks in components of the air conditioners that inhibited the ability of the air conditioners to produce and blow cold air. And they insisted that GM knew about the defect before selling the vehicles.

In an attempt to establish GM's knowledge, the plaintiffs first generally alleged that:

> GM learned of the [air conditioner defect] ... through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; early consumer complaints made directly to GM, collected by [the NHTSA], and/or posted on public online vehicle owner forums; testing done in response to those complaints; [and] aggregate data from GM dealers.

*Id.* at 636 (quoting amended complaint). But the plaintiffs did not rest upon these general allegations concerning testing and evaluation. On the contrary, the plaintiffs described the testing in some detail:

> 243. An adequate pre-release analysis of the design, engineering, and manufacture of the AC Systems in the Class Vehicles would have revealed to GM that the AC Systems were defective and susceptible to cracking, leaking refrigerant, and failing to provide cool air into the passenger cabin.

> 244. Moreover, GM conducts significant durability testing on all of its vehicles, including Class Vehicles. GM asserts that during durability testing at its Milford Proving Grounds "the team drives a test vehicle up to 25,000 miles, though it is in such extreme conditions that it represents 100,000 miles of customer use."

> 245. Indeed, GM is known for its "notoriously rigorous durability tests. In just 18 months, engineers are able to replicate the kind of wear and tear a car would undergo in its entire lifetime, ensuring it will hold up over time once it reaches customer hands."

> 246. GM also claims it is "always pushing ourselves to test even the smallest part of a vehicle to ensure that the entire product from the engine down to the screws and bolts are tough enough to handle the driving our customers need."

> 247. The 2014 Chevrolet Silverado, for example, completed more than 12.5 million miles of testing before General Motors put the vehicle on sale. GM says its fleet of Silverado test vehicles completed more than 4 million miles of combined durability testing and 8.2 million miles of real world driving before being sent into production in Silao, Mexico, Fort Wayne Ind. and Flint, Mich. The testing was done in the scorching deserts of Arizona, the frozen grounds of Kapuskasing, Ontario, and of course

> GM's own test facility. As a result, GM knew or should
> have known that the AC System in Class Vehicles is
> defective and prone to premature failure.

(*GM Air Conditioning* First Am. Compl. at ¶¶ 243-47, E.D. Mich. Case No. 18-md-02818, ECF No. 24, PageID.1073-1075; internal footnotes omitted.)  The plaintiffs' contention that GM exhaustively tested some of the class vehicles in "scorching deserts" – an area in which any driver, including a test driver, would presumably use a vehicle's air conditioning system – lent plausible support to their contention that GM knew about the alleged air conditioning defect.

The plaintiffs in *GM Air Conditioning* also made specific allegations regarding how an increase in replacement part sales of specific air conditioner parts and complaints to GM directly established GM's knowledge of the defect in that case:

> 261. On information and belief, GM, like all vehicle
> manufacturers, communicates with its authorized service
> technicians in order to identify pervasive vehicle defects,
> and root causes and potential repairs. GM collects and
> analyzes field data including, but not limited to, repair
> requests made at dealerships and service centers, technical
> reports prepared by engineers that have reviewed vehicles
> for which warranty coverage is requested, parts sales
> reports, and warranty claims data, in order to determine
> whether a defect exists and should be covered under
> warranty or through a goodwill program.
>
> 262. GM also reviews and analyzes warranty data
> submitted by its dealerships and authorized technicians in
> order to identify defect trends in its vehicles. GM dictates
> that when a repair is made under warranty (or warranty

coverage is requested), service centers must provide GM with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the defective component in case GM later decides to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to GM because GM will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described. Due to GM's efforts to monitor defect trends and the sheer number of repairs and warranty/goodwill requests made in connection with the Defect, GM knew or should have known of the Defect.

[….]

264. Upon information and belief, GM service centers use GM replacement parts that they order directly from GM. Furthermore, independent vehicle repair shops that service Class Vehicles also order OEM parts directly from GM. Therefore GM would have detailed and accurate data regarding the number and frequency of replacement part orders. The ongoing high sales of replacement AC System parts – indeed so much so that the parts were (and continue to be) on national backorder – was certainly known to GM, and should have alerted GM that its AC Systems were defective and causing Class Vehicles' AC Systems to fail.

[….]

266. The full universe of complaints made directly to GM about the AC System Defect is information presently in the exclusive custody and control of GM and is not yet available to Plaintiffs prior to discovery. On information and belief, however, many Class Vehicle owners complained directly to GM dealerships about the AC System failures their Vehicles experienced. For example, some instances of these direct-to-GM complaints were

posted on online on GM's own website forums, and responded to by GM customer service.

(*Id.* at ¶¶ 261-62, 264, 266, PageID.446-448.)

Finally, the TSBs identified and relied upon by the plaintiffs in *GM Air Conditioning* plausibly supported plaintiffs' contention that GM knew about the air conditioning defect because the TSBs specifically referenced that defect. The plaintiffs in *GM Air Conditioning* complained that their air conditioning system failed to blow cold air, and the relied-upon TSBs referenced "cracks in the AC System components that allow refrigerant/refrigerant to leak out, resulting in a 'very low/empty refrigerant level' and the AC System 'blowing warm' air instead of producing cold air" – the exact defect plaintiffs complained about. (*Id.* at ¶254, PageID.444.) As explained above, the TSBs relied upon by Plaintiffs here, on their face, did not mention or identify a core feature of the StabiliTrak Defect. Moreover, unlike here, the plaintiffs in *GM Air Conditioning* alleged that at least one of the relevant TSBs that discussed the "cracks in the AC System" was "highlighted at a 2014 meeting of the Cadillac National Services Managers Council." (*Id.* at ¶250, Page.ID 1076). That allegation further plausibly supported plaintiffs' allegation that GM knew about the defect at issue.

The differences between the knowledge allegations that were sufficient in *GM Air Conditioning* and the knowledge allegations Plaintiffs make here underscore

why the allegations in this case do not support a plausible inference that GM had pre-sale knowledge of the StabiliTrak Defect.[2]

## B

In Count XII of the First Amended Complaint, Plaintiffs, on behalf of a nationwide class, or, in the alternative, on behalf of various state sub-classes, allege that GM has been unjustly enriched "through the sale and lease of the Class Vehicles." (First Am. Compl. at ¶205, ECF No. 19, PageID.386.)  This claim fails for two reasons.

## 1

Plaintiffs' unjust enrichment claim is not cognizable because there is an express contract that covers the same subject matter – namely, the express limited warranty that GM provided at the time the Class Vehicles were first purchased.[3] "Courts will not imply a contract" for the purposes of an unjust enrichment claim

---

[2] The Court is not suggesting that every plaintiff must plead the exact facts pleaded by the plaintiffs in *GM Air Conditioning* or that that decision sets forth a rigid test that all plaintiffs must satisfy.  The Court is saying only that the contrast between the allegations of GM's knowledge of the defect *GM Air Conditioning* and the allegations of GM's knowledge here helps to highlight the insufficiency of the allegations in this case.

[3] GM has attached excerpts from the relevant limited warranties to its motion to dismiss. (*See* ECF Nos. 21-2, 21-3, 21-4, 21-5.)  The Court may consider these warranties in the context of GM's motion to dismiss because they are referred to in Plaintiffs' First Amended Complaint and are central to Plaintiffs' claims. *See*, *e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014).

"where there is an express contract governing the same subject matter." *GM Air Conditioning*, 406 F. Supp. 3d at 634 (emphasis removed) (dismissing unjust enrichment claim). *See also FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties"); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) ("Under [] California ... law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties."). Indeed, courts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims. *See*, *e.g.*, *McKee*, 376 F. Supp. 3d at 762 ("Because the [w]arranty governs [p]laintiff's claims against GM for the Transmission Defect, a claim for unjust enrichment is unavailable to him."); *Mitchell v. Gen. Motors, LLC*, 2014 WL 1319519, at *15 (W.D. Ky. Mar. 31, 2014) (granting GM's motion to dismiss unjust enrichment claim where "the written [w]arranty is an explicit contract that governs their relationship"); *Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at *15 (E.D. Mich. June 7, 2018) (holding that plaintiffs' "unjust enrichment claims … fail because the terms of the GM Limited Warranty governs the parties' rights and obligations with respect to defects in materials and

workmanship, and thus no contract will be implied in law to defeat the GM Limited Warranties' express terms"). Thus, because the express limited warranty governs the same subject matter as Plaintiffs' unjust enrichment claim, that claim fails. *See GM Air Conditioning*, 406 F. Supp. 3d at 635.

Plaintiffs counter that "a pleading at this stage may seek alternative or conflicting grounds for relief." (Resp. to Mot. to Dismiss, ECF No. 28, PageID.709.) While alternative pleading is usually allowed, Plaintiffs may not plead their unjust enrichment claim in the alternative here because it is undisputed that GM's express limited warranty governs the subject matter of Plaintiffs' claims. *See, e.g., GM Air Conditioning*, 406 F. Supp. 3d at 635 (holding that plaintiff could not plead unjust enrichment claim in the alterative where it was undisputed that warranty covered same subject matter as that claim); *Mitchell*, 2014 WL 1319519, at *15 (holding that "[p]laintiff is not permitted to plead … breach of express warranty claims and unjust enrichment in the alternative" where "the parties do not dispute the existence of [the warranty]").[4] *Cf. Elfaridi v. Mercedes-Benz USA, LLC*, 2018 WL 4071155, at *11 (E.D. Mo. Aug. 27, 2018) ("A plaintiff is certainly entitled to bring an unjust enrichment claim as an alternative ground for relief pursuant to Rule 8(e)(2) of the

---

[4] *See also Miller*, 2018 WL 2740240, at *15 ("Plaintiffs' unjust enrichment claim fails not because they pled an alternative claim for breach of the GM Limited Warranty, but rather because the GM Limited Warranty is an agreement between Plaintiffs and GM which governs the same subject matter as the unjust enrichment claims.").

Federal Rules of Civil Procedure. But where the claim is based in part on the express terms of the warranty, it arises out of the warranty contract and must be dismissed.").

## 2

Plaintiffs' unjust enrichment claim also fails because they have not sufficiently pleaded that they conferred a benefit on GM. Here, all of the Plaintiffs purchased their cars on the used-car market, and some even purchased their vehicles from third parties who have no apparent connection to GM. Plaintiffs have neither sufficiently alleged nor explained how their purchases of used vehicles benefited GM. In similar circumstances, courts have dismissed unjust enrichment claims. *See*, *e.g.*, *In re Ford Motor Co., E-350 Van Prods. Liab. Litig.*, 2011 WL 601279, at *6 (D. N.J. Feb. 16, 2011) (dismissing unjust enrichment claim where plaintiff "purchased a used E-350 van from a Ford dealership" because plaintiff had not "explained" how his "purchase of a use vehicle conferred a benefit upon Ford"); *Gerstle v. Am. Honda Motor Co.*, 2017 WL 1477141, at *15 (N.D. Cal. Apr. 25, 2017) ("The Court agrees with Defendant that the purchase of a used car, whether private or certified at a dealership, does not benefit [the manufacturer] because such a purchase has no impact on product allocation. The Court also agrees that the third-party seller, not the manufacturer, receives a benefit when a used car is purchased in an arm's length transaction.") (internal citation omitted), *superseded on other grounds*, *Gerstle v. Am. Honda Motor Co.*, 2017 WL 2797810 (N.D. Cal. June 28,

2017). Plaintiffs' failure to plausibly allege that their used-car purchases benefitted GM further supports dismissal of their unjust enrichment claim.[5]

For all of these reasons, Plaintiffs have failed to state a viable unjust enrichment claim against GM.[6]

## C

### 1

Finally, in Counts V-VI and IX-X of the First Amended Complaint, Plaintiffs Clark, Jones, and Fagre allege that GM breached the implied warranties of the vehicles that they purchased. Plaintiffs bring their breach of implied warranty claims under the federal Magnuson-Moss Warranty Act (the "MMWA"), 15 U.S.C. § 2301 *et seq.*, and the laws of Illinois and Missouri.

---

[5] Plaintiffs rely on two cases for the proposition that a used-car buyer may maintain an unjust enrichment claim against a car manufacturer: *Cabebe v. Nissan of N. Am., Inc.*, 2018 WL 5617732 (N.D. Cal. Oct. 26, 2018) and *Alberin v. Am. Honda Motor Co.*, 2018 WL 1473085 (N.D. Cal. Mar. 26, 2018). These cases are not on point. Neither *Cabebe* nor *Alberin* allowed an unjust enrichment claim to move forward against an automobile manufacturer. Instead, the courts in both cases allowed the plaintiffs to bring *statutory* claims under California's Unfair Competition Law based upon an unjust-enrichment-like theory. Thus, *Cabebe* and *Alberin* do not stand for the proposition that a plaintiff who purchased a used vehicle may bring a standalone, common-law unjust enrichment claim against the vehicle manufacturer.

[6] The Court is not suggesting that a used-car purchaser may never bring an unjust enrichment claim against an automotive manufacturer. There may be some theory and some set of alleged facts under which such a claim may proceed. But Plaintiffs have not pleaded sufficient facts here nor sufficiently explained how they conferred a benefit upon GM.

Under the terms of the express limited warranties that apply to the Class Vehicles, "[a]ny implied warranty of merchantability or fitness for a particular purpose applicable to [the] vehicle is limited in duration to the duration of [the express limited warranty]." (ECF No. 21-2, PageID.654-655; emphasis removed.) Such a restriction on the term of an implied warranty is permissible under the MMWA, Illinois law, and Missouri law. *See* 15 U.S.C. § 2308(b) ("[I]mplied warranties may be limited in duration to the duration of a written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty."); *Norman v. Ford Motor Co.*, 513 N.E.2d 1053, 1055 (Ill. App. Ct. 1987) ("A disclaimer limiting the duration of an implied warranty to the duration of the written warranty is permitted by both the Illinois Commercial Code … and the [MMWA], if the limitation is set forth in clear language and appropriately displayed in the contract."); *Elfaridi*, 2018 WL 4071155, at *10 (enforcing duration of limited warranty under Missouri law).

Here, the duration of the express limited warranties for Plaintiffs' vehicles was 3 years or 36,000 miles, whichever occurred first. (*See* Mot. to Dismiss, ECF

No. 21, PageID.34.[7]) Thus, Plaintiffs' implied warranties were limited to that same time period.

**2**

GM argues that Plaintiffs Clark, Jones, and Fagre cannot state a viable breach of implied warranty claim because "Plaintiffs' vehicles were well beyond [the] warranty period by the time they experienced the alleged issues" with the StabiliTrak Defect. (*Id.*, PageID.643.) The Court agrees.

To maintain a claim for breach of an implied warranty, a plaintiff must, among other things, "seek warranty service within the [] period contained in the … [w]arranty." *In re Ford Motor Co. Speed Control Deactivation Switch Prods. Liab. Litig.*, 2007 WL 2421480, at *7 (E.D. Mich. Aug. 24, 2007). Here, Plaintiffs Clark, Jones, and Fagre sought repairs of their vehicles long after their implied warranties expired. Clark sought a repair of his vehicle when it had 43,142 miles on the odometer (*see* First Am. Compl. at ¶18, ECF No. 19, PageID.335); Jones did not seek a repair until her vehicle had 60,120 miles on the odometer (*see id.* at ¶22, PageID.336); and Fagre did not seek a repair until his vehicle had 66,00 miles on the odometer (*see id.* at ¶30, PageID.340.) Because Plaintiffs' implied warranties

---

[7] Plaintiffs have not disputed that the express limited warranties of the vehicles they purchased were for 3 years or 36,000 miles, whichever occurred first. Instead, as described above, Plaintiffs' argue that those limitations on the implied warranties are unconscionable.

expired before they sought service for their vehicles, they cannot state a viable breach of implied warranty claim against GM. *See In re Ford Motor Co.*, 2007 WL 2421480, at *7 (noting that plaintiffs' breach of implied warranty claims "fail[ed]" because "[n]one of the named Plaintiffs allege[d] that they sought warranty service … within the three-year warranty period"). Moreover, Plaintiffs have not pleaded that the StabiliTrak Defect manifested in their vehicles or that they suffered any injury before their implied warranties expired. That further supports the dismissal of Plaintiffs' breach of warranty claims.[8] *See*, *e.g.*, *Elfaridi* 2018 WL 4071155, at *10 (E.D. Mo. Aug. 27, 2018) (dismissing breach of implied warranty claim where alleged "injury occurred outside of the warranty period").

**3**

Plaintiffs counter that "GM's exclusive knowledge of the StabiliTrack [D]efect warrants a finding that the time and mileage limits of the implied warranty are unconscionable." (Resp. to Mot. to Dismiss, ECF No. 28, PageID.710.) More specifically, Plaintiffs argue that GM "was aware of the StabiliTrak Defect and actively concealed its knowledge." (*Id.*) Thus, Plaintiffs say, "[g]iven GM's superior knowledge, and Plaintiffs' corresponding lack of information about the

---

[8] Because the Court dismisses Plaintiffs' breach of implied warranty claims on the grounds set forth above, the Court need not address GM's other grounds for dismissing these claims (*i.e.*, that Plaintiff's vehicles were merchantable, that Plaintiffs' failed to provide written notice to GM, and that the Illinois Plaintiffs lack privity with GM).

StabiliTrak Defect, it cannot reasonably be said that Plaintiffs' agreement to any warranty limitations was knowing or voluntary." (*Id.*)

In support of Plaintiffs' unconscionability argument, Plaintiffs rely on the decision of the United States Court of Appeals for the Fourth Circuit in *Carlson v. General Motors*, 883 F.2d 287, 296 (4th Cir. 1989). In *Carlson*, the Fourth Circuit held that the durational limits of an implied warranty were unconscionable in light of GM's alleged pre-sale knowledge of the defect at issue:

> Here, proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged durational limitations on implied warranties constituted overreaching, and that the disclaimers themselves were therefore unconscionable. When a manufacturer is aware that its product is inherently defective, but the buyer has no notice of or ability to detect the problem, there is perforce a substantial disparity in the parties' relative bargaining power. In such a case, the presumption is that the buyer's acceptance of limitations on his contractual remedies—including of course any warranty disclaimers—was neither knowing nor voluntary, thereby rendering such limitations unconscionable and ineffective. Evidence of the knowledge of a stronger party that the weaker party will be unable to receive substantial benefits from the contract—or any related showing that the transaction involved elements of deception—should in most cases contribute to a finding of unconscionability in the bargaining process. That is in large measure what the plaintiffs here have claimed; and we therefore cannot say that their amended complaint failed to allege facts which, if proven to the court's satisfaction, could establish that, as a matter of law, GM's durational limitations on the operation of implied warranties were indeed unconscionable.

*Id.* Plaintiffs also rely on the United States District Court of the Southern District of Ohio's decision in *In re Porsche Cars North America, Inc.*, 880 F. Supp. 2d. 801, 822 (S.D. Ohio 2012) ("[A]lthough a manufacturer's knowledge of a defect will not invalidate a durational limitation, the relevant question in the unconscionability context is whether one party abused its superior knowledge and the opposing party's relative ignorance so as to create an exchange of obligations that is substantively unconscionable.").

The Court is not persuaded by Plaintiffs' argument that the durational limits in Plaintiffs' implied warranties are unconscionable based on GM's alleged pre-sale knowledge. First and most fundamentally, for all of the reasons explained in detail above in Section (IV)(A)(3)(a), Plaintiffs have not plausibly alleged that GM had pre-sale knowledge of the StabiliTrak Defect. Thus, this case stands in sharp contrast to *Carlson* and *In re Porsche* where the plaintiffs had plausibly alleged such knowledge. Because Plaintiffs have not plausibly alleged GM's knowledge of the StabiliTrak Defect, Plaintiffs cannot establish that the durational limits in the implied warranties are unconscionable based on that supposed knowledge.

Moreover, even if Plaintiffs had plausibly alleged GM's pre-sale knowledge, for all of the reasons explained in detail in *GM Air Conditioning*, pre-sale knowledge, standing alone, does not render unconscionable the durational limits in an implied warranty. *See GM Air Conditioning*, 406 F. Supp. 3d at 628-30. Plaintiffs

have not persuaded the Court that its analysis in *GM Air Conditioning* was in error or does not apply here.[9] Finally, Plaintiffs' reliance on *Carlson* is also misplaced because there is no indication that the plaintiffs in that case purchased their vehicles on the used car market as Plaintiffs did here. Plaintiffs have not sufficiently explained how they may properly attack the durational limits in the implied warranties as unconscionable where, as used car purchasers, they did not receive the warranties from GM.

For all of these reasons, the Court is not persuaded that the durational limits in Plaintiffs' implied warranties are unconscionable.

## V

At this point, the Court would normally provide Plaintiffs the opportunity to file an Amended Complaint to remedy the pleading deficiencies identified by GM and the Court. But while leave to amend should be "freely give[n] *when justice so requires,*" Fed. Rule Civ. Proc. 15(a)(2) (emphasis added), justice does not require

---

[9] At the hearing on GM's motion to dismiss, counsel for Plaintiffs argued that the Court should not rely on its unconscionability analysis from *GM Air Conditioning* because in that case, the plaintiffs had to show *both* substantive and procedural unconscionability, whereas under the Illinois and Missouri law that applies here, a plaintiff may prevail on a claim of unconscionability by showing *either* substantive *or* procedural unconscionability. (*See* 1/30/2020 Hr'g Tr., ECF No. 37, PageID.1188-89.) That difference does not make *GM Air Conditioning* any less relevant. In *GM Air Conditioning*, the Court held that GM's alleged pre-sale knowledge did not establish either substantive or procedural unconscionability.

that Plaintiffs be permitted to file a Second Amended Complaint here. A careful review of the history of this action shows why.

Plaintiffs filed their initial Complaint on January 18, 2019. (*See* Compl., ECF No. 1.) GM then moved to dismiss that Complaint. (*See* Mot. to Dismiss, ECF No. 13.) Shortly after GM filed that motion, the Court entered an order granting Plaintiffs leave to file a First Amended Complaint. (*See* Order, ECF No. 15.) In that order, the Court informed Plaintiff Hall – who was the only named Plaintiff at that time – that it would "afford [her] an opportunity to remedy the purported defects identified in General Motors' motion to dismiss by granting her leave to file a First Amended Complaint." (*Id.*, PageID.319-320.) The Court then told Hall that (1) this was her "opportunity to allege any and all additional facts, known to her, that may cure the alleged pleading deficiencies in her Complaint" and (2) "[t]he Court [did] not anticipate allowing Hall a second opportunity to amend her Complaint to add factual allegations she could include in her First Amended Complaint." (*Id.*, PageID.320.) Plaintiffs then filed the First Amended Complaint.

This procedure allowed Plaintiffs a full opportunity to allege any and all facts in the First Amended Complaint that supported their claims and that could address GM's arguments for dismissal.[10] The Court adopted this procedure because it did

---

[10] The fact that Plaintiff Hall was the only Plaintiff named in the case at the time the Court entered its order granting leave to amend does not change the Court's analysis. The foundation and factual predicates of all Plaintiffs' claims are the same.

not want to undertake an exhaustive analysis of Plaintiffs' claims until it had given Plaintiffs the opportunity to cure the claimed defects. Nor did the Court want the parties to spend time and resources on motion practice until Plaintiffs had the chance to review GM's arguments in support of GM's motion to dismiss and to augment their claims with additional factual allegations if necessary. The parties and the Court have now spent significant time and resources analyzing the facts and claims in the First Amended Complaint, and it would not be just to require the parties and the Court to repeat this process. The Court therefore declines to grant Plaintiffs leave to amend. *See Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 272-73 (6th Cir. 2018) (affirming denial of request for leave under similar circumstances).

## VI

For all of the reasons stated above, GM's motion to dismiss (ECF No. 21) is **GRANTED** and the First Amended Complaint (ECF No. 19) is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated: March 18, 2020                   UNITED STATES DISTRICT JUDGE

---

Moreover, the newly added Plaintiffs are represented by the same law firm as Plaintiff Hall. And that counsel would have had full notice of the Court's instructions to Hall to allege any and all facts, known to her, that could have remedied the pleading defects identified in GM's initial motion to dismiss.

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 18, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764